IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| HAWAIʻI LEGAL SHORT-TERM RENTAL ALLIANCE, a Hawaiʻi non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF HONOLULU, a municipal corporation; DEPARTMENT OF PLANNING AND PERMITTING OF THE CITY AND COUNTY OF HONOLULU ("DPP"); DAWN TAKEUCHI-APUNA, in her official capacity as Acting Director of the DPP, *et al.*,<br><br>Defendants. | Case No. 22-cv-247-DKW-RT<br><br>**ORDER DENYING MOTION TO INTERVENE BY HAWAIʻI'S THOUSAND FRIENDS, SAVE OʻAHU'S NEIGHBORHOODS, HI GOOD NEIGHBOR, KEEP IT KAILUA, AND SAVE NORTH SHORE NEIGHBORHOODS** |

Five public interest organizations (collectively, the "applicants" or "proposed intervenors") claim a right to intervene in this case as defendants because of their collective interest in upholding and defending Ordinance 22-7. Motion to Intervene ("Motion"), Dkt. No. 32. Although the proposed intervenors and the existing Defendants share the same ultimate objective—to uphold the Ordinance against Plaintiff's statutory and constitutional challenges—the applicants claim to possess unique property interests that the existing Defendants do not adequately represent.

1

The Court does not agree that the existing Defendants inadequately represent proposed intervenors' property interests.  Although, as government entities, they may not own property themselves, the record shows Defendants operate, at least in substantial part, consistent with the *exact* interests cited by the intervenors. Further, the applicants are constituents seeking to ally themselves with a government party.  For each of these reasons, a mandatory *presumption* of adequate representation arises. *See Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003).  In their attempt to make the requisite "compelling" showing of inadequacy to overcome that presumption, proposed intervenors claim that Defendants have a weaker and/or broader interest in defending Ordinance 22-7 than they themselves have.  And they speculate that Defendants may be more willing to negotiate a settlement deal with Plaintiff than they themselves would. But as the Ninth Circuit has explained, such differences in "style and degree" of interest and/or "litigation strategy"—to include settlement tactics—do not constitute "compelling." *See id.*; *Perry v. Proposition 8 Off. Proponents*, 587 F.3d 947, 949 (9th Cir. 2009); *Callahan v. Brookdale Senior Living Comms., Inc.*, 42 F.4th 1013, 1020–21 (9th Cir. 2022).

Moreover, existing Defendants have zealously defended the Ordinance from the inception of this lawsuit, and continue to promise to do so, even in the wake of adverse legal rulings thus far issued in this case.  Proposed intervenors have

identified no legal arguments Defendants would be incapable or unwilling to make in pursuit of their shared objective and in defense of their shared interests.  *See California v. Tahoe Reg'l Planning Agency*, 792 F.2d 775, 778 (9th Cir. 1986).  As a result, the Court finds that proposed intervenors' purported interests are adequately represented, and both mandatory and permissive intervention are DENIED on that basis.  *See* Fed. R. Civ. P. 24(a)–(b).

## LEGAL STANDARDS

### I.  Rule 24(a): Mandatory Intervention

An applicant for intervention as of right bears the burden of demonstrating that: "(1) the intervention application is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the existing parties may not adequately represent the applicant's interest."  *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006) (internal quotation marks and citation omitted); *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004).  In evaluating a Rule 24(a) motion, a court should be "guided primarily by practical and equitable considerations," and the requirements should be construed "broadly in favor of the proposed intervenors." *Callahan*, 42 F.4th at 1020 (9th Cir. 2022) (internal quotation marks and citations omitted).  That said, failure to satisfy any *one* of the

four elements under Rule 24(a), *see Prete*, 438 F.3d at 954, results in denial of intervention.  *Perry*, 587 F.3d at 950.

## II.     Rule 24(b): Permissive Intervention

A trial court has broad discretion to grant permissive intervention if the applicant demonstrates that it (1) possesses a claim which "shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims." *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).  Consideration of the three threshold elements under Rule 24(b) is not the end of the inquiry: the court retains discretion to deny intervention even where the three factors are met.  *Id.*; *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977).

### RELEVANT PROCEDURAL BACKGROUND[1]

Prior to the passage of Bill 41 and consequent enactment of Ordinance 22-7 on April 26, 2022,[2] it was legal for Oʻahu residents to rent their non-Resort district homes to tenants for a minimum of 30 days.  *See* Dkt. No. 31 at 5–7.  Ordinance 22-7 provides that it is no longer lawful to rent such a home for less than *90* days, effectively outlawing 30–89-day rentals.  *Id.* at 37.  The Ordinance provides a 180-

---

[1]The following is an abridged procedural history relevant to the instant Motion.  A more detailed factual and procedural history is set forth in this Court's Order Granting Plaintiff's Motion for a Preliminary Injunction.  *See* Dkt. No. 31 at 3–9.

[2]*Bill041(21), CD2, Ordinance 22-7*, HONOLULU CITY COUNCIL, HONOLULU RECORDS COLLECTION, https://hnldoc.ehawaii.gov/hnldoc/measure/2007 (last visited December 12, 2022).

day phase-out period for owners and operators who are currently lawfully renting their non-Resort district homes for 30–89-day periods ("prior lawful users"). These provisions were originally scheduled to go into effect on October 23, 2022.

On June 6, 2022, Plaintiff Hawai'i Legal Short-Term Rental Alliance, a non-profit corporation whose stated purpose is to create a sustainable business environment for legal property rentals in Hawai'i, *see* Dkt. No. 13-2 ¶ 3; Complaint ¶ 9, Dkt. No. 1, initiated this action against Defendants City and County of Honolulu ("City"), Honolulu Department of Planning and Permitting ("DPP"), and Dawn Takeuchi-Apuna ("Apuna") in her official capacity as Acting Director of the DPP[3] (collectively, "Defendants" or "existing Defendants").  Among other things, Plaintiff's Complaint contends that Ordinance 22-7 violates Hawai'i Revised Statutes § 46-4(a) ("HRS § 46-4(a)") and the Takings Clause of the U.S. Constitution.[4]  *See* Dkt. No. 31 at 9–10.

Accordingly, on July 7, 2022, Plaintiff filed a Motion for Preliminary Injunction ("MPI"), seeking to enjoin the enforcement of Ordinance 22-7 until the

---

[3]Dean Uchida, originally named as a party to this action in his official capacity as DPP Director, has since resigned.  In September 2022, Dawn Takeuchi-Apuna was named Acting Director of the DPP, and in December 2022, she was named Director Designate of the DPP by Hawai'i's new Governor.  Consequently, pursuant to Fed. R. Civ. P. 25(d), Apuna has been substituted for Uchida as Defendant in this case.  *See* Dkt. No. 31 at 1 n.1.

[4]In particular, Plaintiff's statutory argument is that HRS § 46-4(a) bars the county from passing a zoning ordinance that discontinues any previously lawful use of a property—to wit, 30–89-day home rentals—and from phasing out such property use in any zoning district.  Plaintiff's constitutional argument is that 30–89-day home rentals constitute a vested property interest under equitable reliance principles, which the Fifth Amendment to the U.S. Constitution prevents the county from taking without just compensation.

City creates a process to allow prior lawful users to continue their existing 30–89-day rentals.  Dkt. No. 13.  On October 13, 2022, finding that Plaintiff was likely to succeed on the merits of both its statutory and constitutional claims, this Court granted the MPI and temporarily enjoined implementation of the relevant provisions of the Ordinance.  Dkt. No. 31 ("October 2022 Order").

On October 19, 2022, applicants moved to intervene in this case "to ensure that the steps taken to protect Oʻahu's neighborhoods and the property interests of their members through Ordinance 22-7 are fully defended, and not compromised."  Motion at 8.  Applicants are five unincorporated or non-profit organizations that supported the recent passage of Bill 41 and Ordinance 22-7.  Their stated goals are to represent and advocate for their members' neighborhoods and property interests on Oʻahu—interests they say are harmed by "short-term rentals."  *Id.* at 1, 3–5.  Applicants describe themselves thus:

> HAWAIʻI'S THOUSAND FRIENDS ("HTF") is a Hawaiʻi non-profit corporation founded in 1981 to monitor and evaluate environmental, land, and water use proposals and decisions.  HTF's goals include ensuring that: 1) growth is reasonable and responsible; and 2) planning and land use decisions protect natural and cultural resources and human health, and are implemented in conformity with the law.  HTF and many of its members submitted testimony in support of Bill 41.

> SAVE OʻAHU'S NEIGHBORHOODS ("SON") is an unincorporated grassroots community group founded in 2005 . . . whose purpose [is] to establish effective legislation that sustain[s] neighborhood specific groups in their goals to defend and protect the sanctity of residential zoning on Oʻahu.  SON submitted testimony in support of Bill 41.

> HI GOOD NEIGHBOR ("HIGN") is an unincorporated grassroots community group founded in 2017 . . . to defend residential zoning for residents, protect housing stock for working-class residents, and stop the gentrification and commercialization of neighborhoods.
>
> KEEP IT KAILUA ("KIK") is an unincorporated grassroots community group founded in 2004. KIK's purpose is to retain Kailua's family-oriented residential character and quality of life. To that end, KIK's goals include protecting residential zoning, promoting permanent residency in Kailua's neighborhoods, and supporting other community groups with similar goals. KIK's members are largely comprised of individuals who own property located in and/or reside in Kailua, O'ahu. KIK testified in favor of Bill 41 (the bill that ultimately became Ordinance 22-7). KIK's members are concerned with, among other things, the increased non-residential use of Kailua neighborhoods, which leads to inflated housing prices, lack of long-term rental units for residents, increased traffic and a change to the character of the neighborhoods. *See* [Dkt. No. 32-13] at 1 (January 17, 2022 testimony noting that the proliferation of vacation rental units "has hurt our housing market, making it near impossible to buy a reasonably priced home and next to no long-term rentals in some areas").
>
> SAVE NORTH SHORE NEIGHBORHOODS ("SNSN") is an unincorporated grassroots community group founded in 2007. SNSN's purpose is to educate and build awareness among visitors, residents, and homeowners about existing laws and the negative effects of vacation rentals in residential neighborhoods.

*Id.* (internal quotation marks and citations omitted). Applicants contend that their members' property ownership creates a significant protectable interest relating to Ordinance 22-7 that will be impaired if the Ordinance is found to be unconstitutional. They further contend that existing Defendants, as government

entities that may not likewise possess property in the communities affected by Ordinance 22-7, do not share this property interest. *Id.* at 3.

On November 4, 2022, existing Defendants filed a five-page "Statement of No Opposition" to the Motion. Dkt. No. 34. In the Statement, Defendants take the generalized position "that intervention . . . is appropriate" because the outcome of the case will "affect property rights and property valuations" and "Proposed Intervenors assert that their interests and legal rights are distinguished from those of the [existing] Defendants." *Id.* at 2–3. The Statement does not otherwise address applicants' claims that the parties' interests diverge or that existing Defendants are unwilling or incapable of adequately representing applicants' asserted interests. *See generally id.*

Also on November 4, 2022, Plaintiff opposed the Motion. Dkt. No. 35. Plaintiff contends that the Motion is untimely, that proposed intervenors' interests do not constitute "significant, protectable interests," that the outcome of this case will not impair proposed intervenors' abilities to protect their interests, and that existing Defendants adequately represent proposed intervenors' interests. *See generally id.*

On November 11, 2022, proposed intervenors replied, emphasizing Defendants' Statement of No Opposition, *see* Dkt, No. 37 ("Reply") at 2, 12, and highlighting a desire to participate in any settlement negotiations. *Id.* at 4, 14. The

Court heard oral argument on this matter on November 25, 2022, *see* Dkt. No. 40, and this Order now follows.

## DISCUSSION

**I.**     **Mandatory intervention under Fed. R. Civ. P. 24(a) is denied because proposed intervenors have not demonstrated that existing Defendants inadequately represent their interests.**

Failure to establish any one of the four elements for mandatory intervention defeats the application for intervention.  *Perry*, 587 F.3d at 950.  Here, as explained below, proposed intervenors have failed to establish the fourth element—inadequate representation by existing Defendants.[5]

In assessing adequacy of representation, the Court must consider three factors: "whether the interest of a present party is such that it will undoubtedly make all the intervenor's arguments, whether the present party is capable and willing to make such arguments, and whether the intervenor would offer any necessary elements to the proceeding that other parties would neglect."  *Tahoe*, 792 F.2d at 778.  In some cases, satisfaction of this element is "only a minimal challenge."  *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2203

---

[5] For purposes of this Order, the Court assumes, without deciding, that proposed intervenors have satisfied the first three elements: that the Motion is timely, that proposed intervenors possess a significant, protectable interest related to this litigation, and that proposed intervenors' abilities to protect their interest could be impaired by the outcome of the litigation.  *See Prete*, 438 F.3d at 954.

(2022). In other cases, however, the burden on proposed intervenors is higher. *See id.* at 2204.

In the Ninth Circuit, for instance, if one of three discrete circumstances exists, a presumption of adequacy arises, which may only be overcome by a "compelling" or "very compelling" showing of inadequacy. *Arakaki*, 324 F.3d at 1086. The three circumstances include: (1) when the applicant and existing party share the "same ultimate objective"; (2) when "the applicant's interest is identical to that of one of the present parties"; and (3) "when the government is acting on behalf of a constituency that it represents." *Id.*

## A.    The presumption of adequacy applies here.

In order to determine whether the presumption of adequacy applies, the Court begins by identifying proposed intervenors' interests and comparing them to those of existing Defendants. *See Arakaki*, 324 F.3d at 1086 ("The most important factor in determining the adequacy of representation is how the interest compares with the interests of the existing parties.").

Proposed intervenors claim two interests related to this case: one principal and one peripheral. Their principal interest derives from their members' ownership of residential property in Oʻahu neighborhoods, which they say "have been plagued by short-term and vacation rentals," and their status as non-profit organizations dedicated to fighting for their members' property interests and

preserving the character of Oʻahu neighborhoods.  Motion at 2.  Proposed

intervenors assert that "the proliferation of vacation rentals" has led to (i) "inflated

housing prices, . . . making it near[ly] impossible [for residents] to buy a

reasonably priced home"; (ii) "lack of long-term rental units for residents"; (iii)

"increased traffic"; and (iv) "a change to the character of the neighborhoods."[6]  *Id.*

at 5, 8.  Since this case concerns whether the City is allowed to ban 30–89-day

home rentals, and 30–89-day rentals provide short-term housing to non-"residents"

(*e.g.*, those who are not invested in proposed intervenors' communities long-term),

proposed intervenors claim this litigation "directly affect[s]" their interests.  *Id.* at

11; Reply at 6.  As individual property owners and constituents who "specifically

participated in the legislative process in support of Ordinance 22-7," they claim a

special right to participate in this litigation and any settlement discussions because

they "are the best representatives to provide evidence about the disruption their

neighborhoods [] will face in the event Ordinance 22-7 is not implemented."

Motion at 14, 17; Reply at 14.

  Peripherally, proposed intervenors claim that Ordinance 22-7's ban on 30–

89-day rentals is necessary to help the City enforce its *existing* ban on rentals of

---

[6]*See also* Motion at 8 ("Vacation rentals in residential neighborhoods . . . have . . . driven up
property values to the det[riment] of those Hawaiʻi residents who would like to buy or rent a
residence in their own home state."); Reply at 6 ("Vacation rentals unquestionably impact the
very communities and neighborhoods of which Proposed Intervenors are a part . . . , for example
by the effect on property values, real property taxes, and the feel and character of community.").

*less-than-30* days. They assert that some homeowners routinely violate the existing ban by renting their homes to vacationers for short periods only once per month, "using 30-day rentals as a subterfuge for hiding illegal vacation rentals of less than 30 days." *Id.* at 6–8. Those landlords issue 30-day leases to vacationers but only allow *access* for an agreed-upon shorter period—the length of the vacation—and only charge a nightly rate commensurate with the shorter period. By way of illustration, if a tenant wished to rent a home for five nights at a nightly rate of $300, the homeowner would rent to the tenant for a 30-day period at a nightly rate of $50, while only allowing access for the specified five nights. *See* Motion at 6 n.3. Proposed intervenors imply that the enforcement of Ordinance 22-7 is necessary to stop this subterfuge (although they do not explain how or why).[7]

Existing Defendants share these exact same interests. In their memorandum opposing Plaintiff's MPI (*i.e.* filed *before* the present Motion), Defendants spent the vast majority of their discretionary content (i) reciting the lengthy history of

---

[7]Proposed intervenors claim that such actions are not currently illegal. *See* Motion at 6 n.3 ("The land use requirement that rentals be at least 30 days does not in any way [prohibit] rental for less than 30 days so long as there is not more than one rental in that 30-day period. It does not [prohibit], for example, a 5-day rental so long as there is no other rental in a 30-day period."). That assertion is simply wrong. According to the 2019 *Kokua II* Settlement Agreement, if a tenant rents a property for 30 days but only stays 5 days, the tenant must pay the genuine 30-day rate. *See Kokua Coal. v. DPP*, Civil No. 19-00414-DKW-RT ("*Kokua II*") Stipulation & Order ¶ 2, MPI Exh. 6, Dkt. No. 13-9 ("[R]ental agreements, advertisements, solicitations and offers to rent property violate [an existing ordinance] if the price paid for the rental is determined, in whole or in part, by an anticipated or agreed upon occupancy of the property for less than thirty days."). Whether enforcement of this requirement is feasible or occurring are separate questions.

O'ahu's neighborhoods' struggles as a result of the proliferation of residential vacation rentals and (ii) outlining the City and State's legal- and policy-based efforts to curb these supposedly troublesome shorter-term residencies.  Dkt. No. 24 at 3–12, 20–21.  Defendants highlight that the City's General Plan "call[s] for the adoption of a 'comprehensive zoning scheme' that distinguishes between its residents and visitor populations."  Dkt. No. 24 at 4; Dkt. No. 24-3 at 19.  They cite pertinent zoning objectives and policies from the General Plan: (i) "to establish a pattern of population distribution that will allow the people of O'ahu to live and work in harmony"; (ii) "[t]o maintain the viability of O'ahu's resort industry" by "[p]rovid[ing] for the orderly growth of the resort industry by designating appropriate areas of the Island for resort use, including but not limited to Waikiki, Queen's Beach, West Beach, Kuilima, and Makaha," (iii) "[t]o provide decent housing for all the people of O'ahu at prices they can afford"; and (iv) "[t]o reduce speculation in land and housing."  Dkt. No. 24 at 4–5; Dkt. No. 24-3 at 21, 26, 36–37.  They argue that "transient vacation rentals" are not "residential uses" because "they involve frequent rentals [that] are not accessory to and traditionally associated with family living."  Dkt. No. 24 at 15–16.  And they assert the City's prerogative to "restrict[]" these "essentially business, commercial and/or resort type activities" in order "to address zoning impacts like housing supply, the

availability of land for residential use and development, and the preservation of

family values." *Id.* at 20.

Indeed, page one of Ordinance 22-7 itself identifies the varied interests

behind the City's adoption:

> Short-term rentals are disruptive to the character and fabric of our
> residential neighborhoods; they are inconsistent with the land uses
> that are intended for our residential zoned areas and increase the price
> of housing for Oʻahu's resident population by removing housing stock
> from the for-sale and long-term rental markets.  The City Council
> finds that any economic benefits of opening up our residential areas to
> tourism are far outweighed by the negative impacts to our
> neighborhoods and local residents.

> In 2019, the City passed Ordinance 19-18, allowing a limited number
> of new bed and breakfast homes and requiring certain short-term
> rentals to comply with registration requirements, development
> standards, and other regulations.

> The purpose of this ordinance is to better protect the City's residential
> neighborhoods and housing stock from the negative impacts of short-
> term rentals by providing a more comprehensive approach to the
> regulation of transient accommodations within the City.

Dkt. No. 13-4 at 1; *see also* Motion at 6 (quoting this same language and stating

that the City passed the Ordinance "in response to the ongoing and increased use of

Oʻahu's non-resort neighborhoods for short-term rental bookings"); *ibid.* at 8

(noting that the City's own website, www.honolulu.gov, states that "Ordinance 22-

7 . . . is intended to help return housing inventory to both the long-term rental and

for-sale marketplaces").  Even outside this litigation, the City, through DPP, has

lobbied the State Legislature since 2014 to pass a certain House Bill 76, whose

purpose is to amend HRS § 46-4(a), such that it provides Defendants with explicit authority to phase out short-term rentals in residential zoning classifications, in order to "assist the counties in better controlling short-term rentals in particular areas . . . ." *See* Dkt. No. 13-13.

The record, in short, shows that the interests espoused by Defendants, before and throughout this litigation, align squarely with the principal interests of the proposed intervenors.

Defendants further share proposed intervenors' secondary concern about the alleged "subterfuge" by which some homeowners violate existing short-term rental law. During a press conference following this Court's October 2022 Order granting Plaintiff's request for a preliminary injunction against Ordinance 22-7, Honolulu Mayor Rick Blangiardi stated, "I am disappointed, as I feel that the Court did not recognize the importance of [Ordinance 22-7's] 30–89-day restriction in curbing rampant illegal rental activity."[8]

Moreover, existing Defendants—the City, the DPP, and the Director of the DPP—are government entities "acting on behalf of a constituency that [they] represent[]," of which proposed intervenors are a part. *See Arakaki*, 324 F.3d at 1086 (third presumption circumstance); *see also Berger*, 142 S. Ct. at 2204

---

[8]KITV ISLAND TELEVISION, *Court Rules in Favor of Short-term Rental Companies, Halting Mayor Blangiardi's June Provision* (updated Oct. 26, 2022) (last visited Dec. 8, 2022), https://www.kitv.com/news/local/court-rules-in-favor-of-short-term-rental-companies-halting-mayor-blangiardis-june-provision/article_9c6f0f74-4c17-11ed-b2e3-5fd600ed09cd.html.

(acknowledging that in some circuits, "where a member of the public seeks to intervene to defend a law alongside the government . . . a court may presume that legally authorized government agents will adequately represent the public's interest in its chosen law").  Defendants themselves drafted Ordinance 22-7, and their representatives have publicly affirmed their stance of fighting for the Ordinance, as drafted and to its full extent, as recently as October 2022.[9]  *See League of United Lat. Am. Citizens v. Wilson*, 131 F.3d 1297, 1305 (9th Cir. 1997) (affirming a presumption of adequacy where the existing Governor defendant had consistently "spearhead[ed]," "trumpet[ed]," and "tak[en] the offensive in the intense legal battle surrounding [the law in question]").  The fact that proposed intervenors and other like-minded constituents "participated in the legislative process resulting in Ordinance 22-7, including by submitting testimony and engaging with City representatives and others in an effort to protect their property and neighborhoods" only underscores the alignment of interests.  *See* Motion at 7–8.

All three *Arakaki* circumstances are present.  *See* 324 F.3d at 1086. Defendants share *all* of proposed intervenors' cited interests, and have already advocated for those interests in this action, and share their ultimate objective of

---

[9]STEWART YERTON, HONOLULU CIVIL BEAT, *Mayor Vows to Enforce New Law Against Short-Term Rentals*, (Oct. 20, 2022) (last visited Dec. 8, 2022), https://www.civilbeat.org/2022/10/mayor-vows-to-enforce-new-law-against-short-term-rentals/.

upholding the Ordinance against Plaintiff's constitutional and statutory challenges.

Defendants also comprise proposed intervenors' government representatives,

elected, appointed, and/or employed to enact, defend, and enforce zoning laws in

the manner envisioned by proposed intervenors.  A presumption of adequate

representation is therefore applicable.[10]

Proposed intervenors' reliance on *Berger*, 142 S. Ct. 2201–04, deserves

comment.  First, proposed intervenors largely ignore the presumptions set forth in

*Arakaki* and left untouched by *Berger*, continually insisting that they need only

overcome a "minimal" burden to show inadequacy:

> The burden of showing inadequacy of representation is "minimal" and
> satisfied if the applicant can demonstrate that representation of its
> interest "may be" inadequate. . . .  We stress that intervention of right
> does not require an absolute certainty that a party's interests will be
> impaired or that existing parties will not adequately represent its
> interests.  Rule 24(a) has been interpreted to mean that a party whose
> interests are threatened may intervene in an action to protect those
> interests directly if the existing parties may not adequately protect
> their interests.

Motion at 21 and Reply at 11 (emphasis removed) (quoting *Citizens for Balanced

Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 899 (9th Cir. 2011)).  As discussed

above, this is an incomplete statement of the law.  The cited "minimal" burden has

no application where a presumption of adequacy exists.[11]

---

[10]The Court notes that any one of these circumstances is sufficient to justify the presumption and
resulting heightened burden on proposed intervenors.  The Court relies on each.
[11]*See Arakaki*, 324 F.3d at 1086 ("If the applicant's interest is identical to that of one of the
present parties, a compelling showing should be required to demonstrate inadequate

Where proposed intervenors acknowledge the presumption, they attempt to minimize its importance by citing to *Berger*, 142 S. Ct. at 2201.  In *Berger*, the Supreme Court held that the Fourth Circuit had erred in honoring a presumption of adequacy where the intervenors' and existing parties' interests overlapped only at a very "high level of abstraction."  *Id.* at 2203–04.  Proposed intervenors here posit that *Berger* "called into question" the "propriety of the presumption of adequate representation where a proposed intervenor and a party have the same ultimate objective."  Reply at 12 n.8; Dkt. No. 40 (making a similar argument during the November 25, 2022 hearing).

Even if proposed intervenors are correct—that *Berger* impeached the first presumption offered in *Arakaki*—the second and third presumptions are still alive and well.  *Berger* itself acknowledged that:

> [T]he Fourth Circuit has endorsed a presumption of adequate representation where a member of the public seeks to intervene to defend a law alongside the government.  There, the Fourth Circuit has reasoned, a court may presume that legally authorized government agents will adequately represent the public's interest in its chosen laws. . . .
>
> Similarly, some lower courts have adopted a presumption of adequate representation in cases where a movant's interests are identical to those of an existing party.

---

representation."); *ibid.* ("[W]hen the government is acting on behalf of a constituency that it represents . . .  [i]n the absence of a 'very compelling showing to the contrary,' it will be presumed that a state adequately represents its citizens when the applicant shares the same interest.").

*Id.* at 2204; *see also Callahan*, 42 F.4th at 1021 n.5 (relying on the presumption of adequacy based on "identity of interest," which "remains on firm legal footing after *Berger*").

Moreover, proposed intervenors overstate *Berger*'s effect, even on *Arakaki*'s first presumption.[12]  The *Berger* Court did not reject a presumption based on a shared ultimate objective in every case; it instructed only that such a presumption should not have arisen under the facts presented there.

*Berger* arose when the National Association for the Advancement of Colored People ("NAACP") challenged the constitutionality of a controversial voter-ID law.  The state legislature had passed the law, *the Governor had vetoed the law*, and the legislature had then overridden the Governor's veto to enact the law.  The NAACP sued the Governor and the State Board of Elections, moving for a preliminary injunction enjoining enforcement of the law, and the State's attorney general assumed responsibility for defending the Board.  *Members of the legislature* moved to intervene as defendants, arguing that the Governor and attorney general would not adequately represent their interests, given that the Governor's administration opposed the law in question and that it was enacted only by overriding the Governor's veto.  The intervening legislative officials claimed,

---

[12]In *Callahan*, the Ninth Circuit declined to decide whether the first presumption survived *Berger*.  *See* 42 F.4th at 1021 n.5.

among other things, that the Board had consistently offered a "tepid" defense of the law, had conceded that "its primary objective *wasn't* defending [the law], but obtaining guidance regarding which law it would need to enforce," and had failed to offer multiple strong arguments that the intervenors themselves would have offered. *See id.* at 2198–2199. Despite this divergence of interest, a majority of the Fourth Circuit *en banc* held that a presumption of adequacy applied and that the intervenors had failed to overcome it. The Supreme Court reversed. Such an obvious divergence of interest, as in *Berger*, is nowhere evident here and does little to affect the application of *Arakaki*'s presumptions in this case.[13]

---

[13]Applicants also rely on *Idaho Farm Bureau Federation v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995), a case that is equally inapposite. There, after the United States Fish and Wildlife Service ("FWS") listed the Bruneau Hot Springs Snail as an endangered species, a non-profit organization concerned with the rights of farmers and ranchers sued the FWS to set aside the listing. *Id.* at 1397. Another non-profit organization concerned with conservation matters moved to intervene as a defendant, and the Ninth Circuit held it had a right to do so. *Id.* In so holding, the Ninth Circuit found that the conservation organization's interests were not adequately represented by the FWS, principally because the FWS had been extremely reluctant to list the Snail as an endangered species in the first place and would thus be unlikely to vigorously defend the listing. *Id.* at 1398. Indeed, the FWS had only finally issued the listing seven and a half years after first having proposed it—and it then did so only after prolonged pressure from the very conservation organization moving to intervene—pressure that actually culminated in a *lawsuit* by the conservation organization to compel the FWS to make their final ruling on the listing. *Id.* at 1396, 1398. The court found that the FWS "was unlikely to make strong arguments in support of its own actions considering that it proceeded to make a decision largely to fulfill the settlement agreement in the suit [the proposed intervenor-defendant] filed." *Id.* at 1398. Moreover, the court reasoned that "FWS was unlikely to argue on behalf of [the proposed intervenor-defendant]," given that the proposed intervenor was the very organization that had been adverse to FWS in the prior lawsuit. *Id.* As with *Berger*, these facts do not resemble those here, and *Idaho Farm* does not control.

**B.      Proposed intervenors have failed to overcome the presumption.**

Because a presumption of adequacy applies, proposed intervenors may only intervene as of right upon a "very compelling showing" of inadequacy, *see Arakaki*, 324 F.3d at 1086.  They must show, for instance, that Defendants will refuse to make valid arguments or that "necessary elements to the proceeding" will be neglected without their participation.  *See Tahoe*, 792 F.2d at 778.  They do not come close.

In attempting to make the requisite compelling showing, proposed intervenors first rely on Defendants' Statement of No Opposition, Dkt. No. 34.  *See* Reply at 2 ("The City does not oppose intervention, even as to adequate representation."); *ibid.* at 12 ("[T]he City has taken the position that intervention is appropriate, in apparent acknowledgement that the City will not necessarily make all of the same arguments, is not capable and willing to make such arguments, and that the Proposed Intervenors would offer necessary elements to the proceeding that the other parties would neglect."); Dkt. No. 40 (making a similar argument during the November 25, 2022 hearing).

Defendants' Statement of No Opposition, however, does not concede any of these particulars.  Rather, when given the opportunity, Defendants sidestepped the issue, unremarkably (re-)stating only what the proposed intervenors themselves said: "Proposed Intervenors assert that their interests and legal rights are

distinguished from those of the City Defendants."  Dkt. No. 34 at 2–3; *see also* Dkt. No. 40 (declining to affirmatively assert that Defendants would not adequately represent proposed intervenors' interests).  Moreover, such a concession would have been disingenuous—at least without some persuasive explication of the *Tahoe* factors, to include what specific arguments Defendants would be unwilling to make and/or what "necessary elements" they would neglect—given how closely Defendants' interests align with those of proposed intervenors, interests they have uniformly embraced throughout this litigation.  *See, e.g.*, Dkt. No. 24 at 3–12 (reciting forty years' worth of legislative and policy-work toward these ends).

Proposed intervenors double-down, offering that Defendants have a *weaker* stake in their shared interests.  Stated another way, proposed intervenors claim they are better suited than existing Defendants to defend Ordinance 22-7 because they themselves are more committed to protecting their own properties and neighborhoods than Defendants are.  *See, e.g.*, Motion at 14 ("Proposed Intervenors are the best representatives to provide evidence about the disruption [to] their neighborhoods . . . ."); *ibid.* at 9 ("Proposed Intervenors and many of their members advocated for stricter and more robust rental restriction enforcement and a longer minimum rental period which the City refused to adopt.").  These claims reflect differences in "style and degree" of the parties' otherwise identical

interests. *See Perry*, 587 F.3d at 949. Such differences do not defeat the presumption of adequacy. *Id.* That is because the presumption does not ask whether existing Defendants are the "best" parties to defend a lawsuit, but only whether proposed intervenors' interests are adequately represented.

Along similar lines, proposed intervenors claim that the government Defendants have *broader* or more varied interests than the ones they share. As an example, they say Defendants are concerned with *all* residential properties on Oʻahu, in accordance with their general zoning authority, while proposed intervenors are focused on their own specific properties. Motion at 9 ("[T]he Proposed Intervenors do not share the same overarching interests as the City, which is focused on policies for the general good, and not protection of individual's specific property interests."); *ibid.* at 23–24 ("It is simply not the case that the City's *general* defense of Ordinance 22-7 adequately represents the individual and specific interests of the Proposed Intervenors."). As another example, they note the City's "interest in increasing its tax base through taxes on short-term rentals—an interest that diverges from those of Proposed Intervenors." Motion at 9; Dkt. No. 40 (Defendants conceding that they have an interest in avoiding damages and protecting the City's "pocketbook").

Again, proposed intervenors miss the mark. Rule 24 asks whether *proposed intervenors* possess an interest that is not being represented by *Defendants*—not

the other way around. *See Arakaki*, 324 F.3d at 1086.[14]  Defendants' possession of

*additional* interests, on top of the ones they share with proposed intervenors, does

not defeat the presumption.  And *Arakaki* certainly does not require the parties'

interests to be perfectly aligned.  If it did, the presumption would be practically

meaningless, for a Venn diagram of two entities' interests will rarely, if ever, be a

single circle.  *Cf. Prete*, 438 F.3d at 957 ("Virtually all governments face budget

constraints generally, and if such a basis were sufficient to establish inadequate

representation, it would eliminate the presumption of adequate representation when

the government and the intervenor-applicant share the same interest.").

Finally, proposed intervenors believe that the City will settle more readily

than they themselves would, and they assert their wish to participate in any

settlement discussions as a full-fledged party—in other words, giving them far

more authority than they had as members of the commenting public during the

legislative process.  Among their particular concerns is the fact that the Magistrate

Judge instructed the parties to consider a "targeted solution concerning discrete

parties/properties in this action, as opposed to a possible legislative remedy."

Reply at 4 (citing Dkt. No. 29).  Proposed intervenors postulate:

> The existing parties did not express hesitation to discuss "discrete"
> settlement options, and indeed entered into those discussions (which
> were closed to the public) voluntarily. . . .

---

[14] *See also, e.g.*, *Perry*, 587 F.3d at 951 (considering whether the intervenors had broader interests than the existing party, not vice versa).

Indeed, it is entirely possible that the present parties to this case would work towards some sort of agreement whereby certain properties would be allowed nonconforming use certificates, resulting in potentially thousands of mini-hotels and visitor lodging businesses in neighborhoods, that can never be removed.  In some neighborhoods and communities, that would result in *de facto* resort districts.  While that may be acceptable to the City, and beneficial to [Plaintiff], such an outcome would not be representative of Proposed Intervenors' interests.

While the Mayor may have stated publicly that the City plans to vigorously defend the ordinance, there is still the possibility that the City would entertain settlement and that those discussions would continue to occur throughout the litigation process.  Unless Proposed Intervenors are allowed to participate in those discussions, and the issues and arguments important to them are raised, their interests are not fully represented.

*Reply* at 12–14; Dkt. No. 40 (similar).[15]

First, proposed intervenors are simply speculating.  Because, as they acknowledge, settlement discussions ordered by the Court in this case were "closed to the public," they have no idea whether existing parties did or did not "express hesitation to discuss 'discrete' settlement options."  Whether the City, then, would settle this case "more readily" than proposed intervenors is a matter of guesswork, not fact.

---

[15] *See also* Reply at 12 ("Proposed [i]ntervenors have highlighted the caution that must be taken in any settlement discussions."); Motion at 9 n.4 ("It is [p]roposed [i]ntervenors' belief that the owners/operators who comprise the [P]laintiff group here and in *Kokua* file these lawsuits with the intent of reaching a compromise for specific properties directly with the City, and outside of the public participation arena that is otherwise required for zoning regulations.").

Second, as with differences in style and degree, the Ninth Circuit has advised that "[d]ivergence of tactics and litigation strategy," including settlement strategy, does not defeat the presumption of adequacy. Two cases are particularly instructive. In *Callahan*, the Ninth Circuit held that a proposed intervenor had not overcome a presumption of adequacy where her "primary contention" was that the "settlement amount [wa]s too small." 42 F.4th at 1021. In so holding, the court reasoned:

> [The proposed intervenor]'s argument that [the existing party] should not have settled the [] action for the agreed-upon amount ultimately amounts to a disagreement over litigation strategy. . . . And '[w]hen a proposed intervenor has not alleged any substantive disagreement between it and the existing parties to the suit, and instead has rested its claim for intervention entirely upon a disagreement over litigation strategy or legal tactics, courts have been hesitant to accord the applicant full-party status.' Therefore, [the proposed intervenor]'s assertion that she would not have agreed to the settlement is insufficient to show that [the existing party] did not adequately represent her interests.

*Id.* (quoting *League*, 131 F.3d at 1306).

Similarly, in *Perry*, the Ninth Circuit held that a public interest organization that proposed intervention ("Campaign") had failed to overcome the presumption of adequacy where its interests were represented by the existing defendant ("Proponents"), but its strategies were not. 587 F.3d at 955.[16] Campaign's

---

[16]*Perry* involved California's Prop. 8, the state ballot initiative that restricted marriage to those unions between a man and a woman. A gay rights organization sued the state of California to enjoin Prop. 8 on constitutional grounds, and, as the state took no position on the constitutionality of the law, the district court allowed a public interest organization, the Official

26

principal argument was that Proponents had thus far agreed to some stipulations the Campaign itself would not have made. *Id.* After finding that the Proponents were "capable and willing to make the Campaign's arguments in support of Prop. 8," the court concluded:

> Although it appears that the Proponents may not defend Prop. 8 in the exact manner that the Campaign would, the Campaign has not shown that Proponents have conceded any "*necessary* elements to the proceeding." *Arakaki,* 324 F.3d at 1086 (emphasis added). Rather, the Proponents' Case Management Statement documents their intention to mount a full and vigorous defense of Prop. 8's constitutionality. To the extent that there is disagreement between the Proponents and the Campaign, it is best characterized as a dispute over litigation strategy or tactics. As we have held, "mere [] differences in [litigation] strategy . . . are not enough to justify intervention as a matter of right." *United States v. City of L.A.,* 288 F.3d 391, 402–03 (9th Cir. 2002); *Nw. Forest Res. Council v. Glickman,* 82 F.3d 825, 838 (9th Cir. 1996) (holding that "minor differences in opinion" between the parties and proposed intervenor "fail[] to demonstrate inadequacy of representation"); *see also Daggett v. Comm'n on Governmental Ethics and Election Pracs.*, 172 F.3d 104, 112 (1st Cir. 1999) (noting that "[o]f course, the use of different arguments as a matter of litigation judgment is not inadequate representation *per se* ").

*Id.* at 952, 954–55.

As in *Callahan* and *Perry*, so too here. Proposed intervenors' interests and arguments are represented by Defendants, even though their strategies may not be. And proposed intervenors have identified no arguments that existing Defendants

---

Proponents of Prop. 8 and ProtectMarriage.com, to intervene as a defendant. A like-minded public interest organization, Campaign for California Families, sought to intervene to defend Prop. 8 alongside Proponents. *Id.* at 950.

are unwilling to make, nor any element necessary to the proceeding that

Defendants will neglect.[17]  *See Tahoe*, 792 F.2d at 778.[18]  Any willingness on the

part of existing Defendants to engage in settlement discussions does not impugn

their dedication to defending their position.  Weighing their options, especially in

light of this Court's reasoned October 2022 Order finding a likelihood of

Plaintiff's success on the merits of its case, would be a valid litigation strategy and

no reason to permit intervention.

     In short, proposed intervenors have identified nothing that they will add to

this case other than their litigation strategies and their passion for the issues.  Those

features, even if admirable, do not entitle them to intervene as of right.[19]

---

[17]For the first time during oral argument, proposed intervenors described two arguments that they believed the City had thus far failed to make: first, that Plaintiff's claims require federal abstention under the *Pullman* doctrine and, second, that the language of HRS § 46-4(a) already allows the City to phase out 30–89-day rentals.  *See* Dkt. No. 40.  Assuming abstention is a valid defense here (the issue has not been briefed), proposed intervenors have not shown that Defendants are unwilling or incapable of making the argument.  Nor can they, as Defendants reserved the right to do so in their pleadings.  *See* Dkt. No. 12 at 16 (Twenty-Seventh Affirmative Defense).  The Court disagrees that existing Defendants have failed to make the second argument.  Indeed, the Court's October 2022 Order responded to this argument in depth. *See* Dkt. No. 31 at 12–21 (holding that the language of HRS § 46-4(a) does not allow the City to phase out 30–89-day rentals in any zoning district).  Regardless, proposed intervenors cannot credibly claim that Defendants would be unwilling to make the argument in the future, given the DPP's adoption of that exact argument in testimony before the State Legislature in support of House Bill 76.  *See* Dkt. No. 31 at 20 n.19.

[18]*Cf. Western Watersheds Project v. Haaland*, 22 F.4th 828, 842 (9th Cir. 2022) (holding an intervenor overcame a presumption of adequacy by, among other things, identifying three specific arguments that the existing party had not raised before the district court); *United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) (finding inadequate representation where "the government's arguments would not include certain" arguments the intervenors had proposed).

[19]Proposed intervenors also rely on *Idaho Farm*, in which the Ninth Circuit stated, "A public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported."  58 F.3d at 1397.  This statement was made while discussing the

## II.   **Permissive intervention under Fed. R. Civ. P. 24(b) is denied pursuant to the Court's discretion.**

Three elements are required for permissive intervention under Rule 24(b). *See* Legal Standards, Sec. II, *supra*.  Even where these threshold conditions are met, the trial court retains broad discretion to consider various factors in deciding whether intervention is appropriate.  *See Glickman*, 159 F.3d at 412; *Spangler*, 552 F.2d at 1329 (describing some of the practical considerations available to the trial court).

Here, it is not apparent that the threshold conditions have been met.  Beyond their asserted "property interests," proposed intervenors have not demonstrated that they possess a cause of action against Plaintiff or Defendants, or that the court has an independent basis for jurisdiction over any such claims.  *See Glickman*, 159 F.3d at 412 (first and third conditions for permissive intervention).  For instance, proposed intervenors have not asserted that they have an affirmative right to the implementation of Ordinance 22-7.

Moreover, even if the threshold conditions have been met, the Court would nonetheless deny permissive intervention.  To the extent proposed intervenors may have a legally protectable interest, that interest is, as discussed above, adequately

_____

*second* element of mandatory intervention—whether the public interest group possessed a protectable interest that may be impeded by disposition of the litigation.  It was not meant as a summary substitute for all four elements of Rule 24(a), including the *fourth* element discussed herein.

29

represented by the government Defendants.  *See Spangler*, 552 F.2d at 1329 (allowing trial court to consider adequate representation when deciding whether to grant permissive intervention).  Allowing the five identified organizations to intervene could impair the efficient resolution of the case, while contributing little to such resolution.  *Cf. Perry*, 587 F.3d at 955–56 (finding that permitting intervention "might very well delay the proceedings, as each group would need to conduct discovery on substantially similar issues," and would, "in all probability[,] consume additional time and resources of both the Court and the parties").

## **CONCLUSION**

For the reasons set forth herein, the motion to intervene, Dkt. No. 32, is DENIED.

IT IS SO ORDERED.

DATED: December 12, 2022 at Honolulu, Hawaiʻi.

_____
Derrick K. Watson
Chief United States District Judge